

**U.S. Department of Justice**

Criminal Division

*1400 New York Avenue, NW*
*Washington, D.C. 20530*

December 15, 2014

Evan R. Chesler, Esq.
Benjamin Gruenstein, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475

US 2C SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: DEC 1 7 2014

> Re:   *United States* v. *Avon Products (China) Co. Ltd.*

Dear Counsel:

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and on the understandings specified below, the United States of America, by and through the Criminal Division, United States Department of Justice, and the Office of the United States Attorney for the Southern District of New York (collectively the "Department") will accept a guilty plea from Avon Products (China) Co. Ltd. ("Avon China" or the "defendant") to Count One of the above-referenced superseding information (the "Information"). Count One charges the defendant with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371, and carries a maximum fine of the greatest of $500,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, 18 U.S.C. § 3571(c)(3), (d); five years' probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).

### The Defendant's Agreement

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), Avon China agrees to waive its right to indictment by a grand jury and further agrees to plead guilty to the one-count Information in this case. Upon acceptance by the Court of this Agreement, the defendant further agrees to persist with that plea through sentencing and, as set forth below, to cooperate fully with the Department in its investigation into all matters related to the conduct charged in the Information.

The defendant understands and agrees that this Agreement is between the Department and Avon China. This Agreement does not bind any other division or section of the Department of Justice, or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority. The Department will bring this Agreement and the cooperation of the defendant, its direct or indirect affiliates, subsidiaries, and parent corporation, to the attention of other prosecuting authorities or other agencies, if requested by the defendant.

The defendant agrees that this Agreement will be executed by an authorized corporate representative. Defendant further agrees that a Resolution duly adopted by the defendant's Board of Directors, attached to this Agreement as Exhibit 1, represents that the signatures on this Agreement by Avon China and its counsel are authorized by defendant's Board of Directors.

The defendant agrees and represents that it has the full legal right, power, and authority to enter into and perform all obligations under this Agreement.

The defendant agrees to pay to the United States a criminal fine in the amount of $67,648,000. The defendant agrees to wire transfer $67,648,000 within ten (10) business days of sentencing to the Clerk of the Court for the United States District Court for the Southern District of New York. The defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of New York the mandatory special assessment of $400 per count within five (5) business days from the date of sentencing.

The defendant agrees that if it, its parent corporation, or any of its direct or indirect affiliates or subsidiaries, issues a press release or holds a press conference in connection with this Agreement, the defendant shall first consult with the Department to determine whether (a) the text of the release or proposed statements at any press conference are true and accurate with respect to matters between the Department and the defendant; and (b) the Department has an objection to the release or statement. Nothing in this Paragraph restricts the defendant, its parent corporation, or any of its direct or indirect affiliates or subsidiaries, from fulfilling obligations under the federal securities laws or from interacting with investors.

The defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

      a.      To plead guilty as set forth in this Agreement;

      b.      To abide by all sentencing stipulations contained in this Agreement;

      c.      To: (i) appear, through duly appointed representatives, as ordered for all Court appearances; and (ii) obey any other ongoing Court order in this matter;

      d.      To commit no further crimes;

      e.      To be truthful at all times with the Court; and

      f.      To pay the applicable fine and special assessment.

The defendant agrees to cooperate fully with the Department in any and all matters relating to the conduct described in this Agreement, the Statement of Facts attached as Exhibit 2, and the criminal Information filed pursuant to this Agreement, and other conduct related to possible corrupt payments, false books and records, or the failure to implement or circumvention of internal controls, subject to applicable law and regulations, until the date upon which all

investigations and prosecutions arising out of such conduct are concluded. At the request of the Department, the defendant agrees to also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the defendant, its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement, the Statement of Facts, and the Information. The defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

        a.      The defendant agrees to truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the defendant has any knowledge or about which the Department may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the defendant to provide to the Department, upon request, any document, record or other tangible evidence about which the Department may inquire of the defendant.

        b.      Upon request of the Department, the defendant agrees to designate knowledgeable employees, agents or attorneys to provide to the Department the information and materials described in Paragraph (a) above on behalf of the defendant. The defendant further agrees to provide complete, truthful, and accurate information at all times.

        c.      The defendant agrees to use its best efforts to make available for interviews or testimony, as requested by the Department, present or former officers, directors, employees, agents and consultants of the defendant. This includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the defendant, may have material information regarding the matters under investigation.

        d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Department pursuant to this Agreement, the defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Department, in its sole discretion, shall deem appropriate.

        e.      During the Term of the Deferred Prosecution Agreement between the defendant's parent company, Avon Products, Inc., and the Department, should the defendant learn of credible evidence or allegations of possible corrupt payments, false books and records, or the failure to implement or circumvention of internal controls, including the existence of internal or external investigations into such conduct, the defendant agrees to promptly report such evidence or allegations to the Department.

The defendant agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, the defendant shall include in any contract for sale, merger, or transfer a provision fully binding the purchaser(s) or any successor(s) in interest thereto to the obligations in this Agreement.

## The United States' Agreement

In exchange for the corporate guilty plea of the defendant and the complete fulfillment of all of its obligations under this Agreement, and in exchange for the agreement of the defendant's parent corporation, Avon Products, Inc., to assume all of the obligations set forth in a Deferred Prosecution Agreement in a parallel matter, the Department agrees that it will not file additional criminal charges against the defendant or any of its direct or indirect affiliates or subsidiaries, or its parent corporation, relating to:

        a.    the conduct described in the Statement of Facts attached as Exhibit 2 or the criminal Information filed pursuant to this Agreement; or

        b.    information disclosed by the defendant or its parent corporation, Avon Products, Inc., to the Department prior to the date of this Agreement.

This Agreement does not provide any protection against prosecution for any corrupt payments, false accounting, or internal accounting controls violations in the future by the defendant, or by any of its officers, directors, employees, agents, or consultants, whether or not disclosed by the defendant pursuant to the terms of this Agreement. This Agreement also does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the defendant, who may have been involved in any of the matters set forth in the Information, Statement of Facts, or in any other matters.

## Factual Basis

The defendant is pleading guilty because it is guilty of the charges contained in the sole count of the Information. The defendant agrees and stipulates that the factual allegations set forth in the Statement of Facts, attached hereto and incorporated herein as Exhibit 2, are true and correct and accurately reflect the defendant's criminal conduct. The parties further stipulate and agree to the Statement of Facts attached hereto and incorporated herein as Exhibit 2.

## Defendant's Waiver of Rights, Including the Right to Trial and Appeal

The defendant represents to the Court that defendant is satisfied that the defendant's attorneys have rendered effective assistance. Defendant understands that by entering into this Agreement, the defendant surrenders certain rights as provided in this Agreement. Defendant understands that the rights of defendants include the following:

a. If the defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

b. At a trial, the United States would be required to present its witnesses and other evidence against the defendant. The defendant would be able to confront those witnesses and the defendant's attorney would be able to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on its own behalf. If the witnesses for the defendant would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

c. At a trial, no inference of guilt could be drawn from the defendant's refusal to present evidence. However, if the defendant desired to do so, it could present evidence on its behalf.

The defendant understands that nothing in this Agreement will restrict access by the United States Probation Office or the Court to information and records in the possession of the United States or any of its investigative law enforcement agencies, including state and local law enforcement agencies, as well as information, documents and records obtained from the defendant.

The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Should the Court impose the sentence proposed herein, the defendant agrees that it will waive the right to appeal the plea, conviction, and sentence (or the manner in which it was determined) on the grounds set forth in Title 18, United States Code, Section 3742. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

The defendant is also aware that the United States Constitution and the laws of the United States afford the defendant the right to contest or "collaterally attack" its conviction or sentence after the conviction has become final. Knowing that, the defendant knowingly waives the right to contest or "collaterally attack" the defendant's plea, conviction, and sentence, provided that such sentence is consistent with the terms of this Agreement, by means of any post-conviction proceeding.

The defendant waives all defenses based on the statute of limitations with respect to any prosecution relating to the conduct described in the attached Statement of Facts that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the defendant violates this Agreement; or (c) the plea is later withdrawn, provided that such prosecution is brought within one year of any such vacation of conviction, violation of the agreement, or withdrawal of the plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Department is free to take any position on appeal or any other post-judgment matter.

Defendant waives all defenses to the conduct charged in the Information based on venue, speedy trial under the United States Constitution and Speedy Trial Act, and any and all constitutional and non-jurisdictional defects.

## Penalty

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest, 18 U.S.C. § 3571(c)(3), (d); five years' probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).

        a.      The defendant hereby stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine, penalty, special assessment, or forfeiture order pursuant to the automatic stay or other provision of the United States Bankruptcy Code.

        b.      The defendant agrees that nothing in this Agreement is intended to release the defendant from any and all of the defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

## Sentencing Factors

The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in 18 U.S.C. § 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.

The Department and the defendant agree that a faithful application of the United States Sentencing Guidelines (USSG) to determine the applicable fine range yields the following analysis:

        a.      The 2013 USSG Manual sets forth the appropriate guidelines to be used in this matter.

        b.      <u>Offense Level</u>: Based upon USSG §2B1.1, the total offense level is 32, calculated as follows:

            (a)(2)  Base Offense Level                6

| | | |
|---|---|---|
| (b)(1) Value of resulting gain more than $50,000,000 | | +24 |
| (b)(10) Substantial Part of the Scheme Outside the U.S. | | +2 |
| **TOTAL** | | 32 |

a.     Base Fine. Based upon USSG § 8C2.4(a)(2), the base fine is $52,850,000 (the resulting gain to the organization)

b.     Culpability Score. Based upon USSG § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(2) | the organization had 1,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +4 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 7 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $52,850,000 |
| Multipliers | 1.4(min)/2.8(max) |
| Fine Range | $73,990,000/ $147,980,000 |

### Sentencing Recommendation

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Department and the defendant agree that the following represents the appropriate disposition of the case:

    a.     Fine. The parties agree that the imposition of a fine in the amount of $67,648,000 is appropriate in this case.

    b.     Organizational Probation. The parties agree that a term of organizational probation is not appropriate in this case, as the defendant's parent corporation, Avon Products,

Inc., has separately agreed to the retention of an independent corporate monitor, pursuant to the Deferred Prosecution Agreement referenced above.

        c.    <u>Mandatory Special Assessment.</u>  The defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of New York within (5) business days of the time of sentencing the mandatory special assessment of $400 per count.

        d.    <u>Court Not Bound.</u>  This agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the defendant's counsel that the Court is not required to follow the Agreement and afford the defendant the opportunity to withdraw its plea; and (c) advise the defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the Agreement contemplated. The defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement. The defendant, however, also understands that if the Court accepts this Agreement, the Court is bound by the sentencing recommendations in paragraph 22.

### Consolidation of Plea and Sentencing and Waiver of Presentence Investigation

The parties agree, subject to the Court's approval, to waive the requirement for a presentence report, pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing power. The parties, however, agree that in the event the Court orders the preparation of a presentence report prior to sentencing, such order will not affect the agreement set forth herein. Additionally, if the Court directs the preparation of a presentence report, the Department will fully inform the preparer of the presentence report and the Court of the facts and law related to the defendant's case.

The parties further agree to request that the Court combine the entry of the guilty plea and sentencing into one proceeding. The parties, however, agree that in the event the Court orders that the entry of the guilty plea and sentencing hearing occur at separate proceedings, such an order will not affect the Agreement set forth herein.

### Breach of the Plea Agreement

If the defendant breaches the terms of this Agreement, or commits any new criminal offense between signing this Agreement and sentencing, the Department is relieved of its obligations under this Agreement, but the defendant may not withdraw its guilty plea. Whether the defendant has breached any provision of this Agreement shall be determined solely by the Department.

In the event the Department determines that the defendant has breached this Agreement, the Department agrees to provide the defendant with written notice of such breach prior to

instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the defendant shall have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions the defendant has taken to address and remediate the situation, which explanation the Department shall consider in determining whether to pursue prosecution of the defendant.

In the event of a breach of this Agreement by the defendant:

      a.    Avon China shall be fully subject to criminal prosecution for any crimes, including perjury and obstruction of justice;

      b.    the Department will be free to use against Avon China, directly and indirectly, in any criminal or civil proceeding any of the information or materials provided by Avon China pursuant to this Agreement, as well as the admitted Statement of Facts contained herein; and

      c.    should the Department elect to pursue criminal charges or any civil action that was not filed as a result of this Agreement, then Avon China agrees that any applicable statute of limitations is tolled between the date of Avon China's signing of this Agreement and the discovery by the Department of any breach by Avon China, and Avon China waives all defenses based on the statute of limitations, venue, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.

### Complete Agreement

This written Agreement constitutes the complete plea agreement between the parties. No promises or representations have been made by the United States except as set forth in writing in this Agreement. The defendant acknowledges that no threats have been made against the defendant and that the defendant is pleading guilty freely and voluntarily because the defendant is guilty. Any modification of this Agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.


**AGREED:**

**FOR AVON PRODUCTS (CHINA) CO., LTD.:**


Date: 12/17/2014      By: _____

                       Jeff Benjamin
                       Avon Products, Inc.
                       Senior Vice President, General Counsel & Chief Ethics & Compliance Officer

Date: 12/17/2014     By: _____

Evan R. Chesler
Benjamin Gruenstein
Cravath, Swaine & Moore LLP
Counsel to Avon Products (China) Co. Ltd.


**FOR THE DEPARTMENT OF JUSTICE:**

William J. Stellmach
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice


Date: 12/17/14     By: _____

Laura N. Perkins
Senior Trial Attorney


Preet Bharara
United States Attorney
Southern District of New York


Date: 12/16/14     By: _____

Sarah E. Paul
Assistant United States Attorney


Date: 12/16/2014     By: _____

Richard Tarlowe
Chief, Complex Frauds and Cybercrime Unit


10

### Certificate of Corporate Resolutions

I, Jian Zhao, hereby certify that I am a director of Avon Products (China) Co.
Ltd. ("Company") and that the following are true, complete, and correct
copies of resolutions adopted by the Board of Directors of the Company on
December 15, 2014. I further certify that such resolutions have not been
amended, modified, rescinded, or revoked, and are in full force and effect on
the date hereof.

### RESOLVED THAT:

The Board of Directors has been fully informed by its counsel of the proposed settlement
with the United States Department of Justice ("DOJ") in connection with the DOJ's
investigation into a criminal violation of the Foreign Corrupt Practices Act ("FCPA"),
and the key terms of the proposed settlement have been explained or distributed to the
Board of Directors.

Pursuant to the Plea Agreement between the Company and the DOJ: (1) the Company
will, through an authorized agent, plead guilty to conspiracy to violate the books and
records provision of the FCPA; (2) the Company will pay a fine of approximately
$67,648,000; and (3) the Company will agree to the other commitments set out on the
Plea Agreement. The Board of Directors has been fully advised by its counsel of its
rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of
entering into the Plea Agreement.

The Board of Directors hereby approves the proposed settlement related to the
completion of the proceeding against the Company, and approves and authorizes the
Company, through its authorized agent, to enter into the Plea Agreement in substantially
such form as reviewed by the Board of Directors, and the actions contemplated thereby,
including the entry by the Company of a guilty plea.

The Board of Directors hereby empowers and obliges Jeff Benjamin, General Counsel
and Chief Ethics & Compliance Officer for Avon Products, Inc., or his delegate to: (1)
execute and deliver the Plea Agreement and any other documents necessary to enter into
the proposed settlement with the DOJ; and (2) enter a guilty plea before the United States
District Court for the Southern District of New York and accept the sentence of said court
on behalf of the Company.

IN WITNESS HEREOF, the undersigned has executed this on December 15, 2014.

_____
Jian Zhao

**EXHIBIT 2**

**STATEMENT OF FACTS**

1.    The following Statement of Facts is incorporated by reference as part of the Plea

Agreement between the United States Department of Justice, Criminal Division, Fraud Section,

the United States Attorney's Office for the Southern District of New York (collectively, the

"Department") and AVON PRODUCTS (CHINA) CO. LTD. ("AVON CHINA"), and the

parties agree and stipulate that the following information is true and accurate.  AVON CHINA

admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors,

employees, and agents as set forth below.  Had this matter proceeded to trial, AVON CHINA

acknowledges that the Department would have proven beyond a reasonable doubt, by admissible

evidence, the facts alleged below and set forth in the criminal Information.  This evidence would

establish the following:

### *Relevant Corporate Entities and Individuals*

2.    At all times relevant to this Statement of Facts, Avon Products, Inc. ("Avon") was

a global company that sold beauty products, home products, and health products in more than

100 countries.  Avon sold its products primarily through direct (door-to-door) sales and was one

of the world's largest direct sellers.  Avon's direct selling involved the use of independent sales

representatives who sold products directly to consumers.  Avon had approximately five to six

million active sales representatives, who were independent contractors that purchased products

from Avon at a discount and then sold them directly to customers.  In addition to its five to six

million independent sales representatives, Avon and its subsidiaries collectively had

approximately 40,000 to 50,000 employees, over 6,000 of whom worked in the United States.

Avon was incorporated and headquartered in New York, New York.

3.     At all times relevant to this Statement of Facts, Avon issued and maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and was required to file periodic reports with the SEC under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, Avon was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.  Avon's shares traded on the New York Stock Exchange under the symbol "AVP."

4.     At all times relevant to this Statement of Facts, AVON PRODUCTS (CHINA) CO. LTD. ("AVON CHINA") was an indirect subsidiary of Avon incorporated in China. AVON CHINA and its affiliates manufactured and sold beauty and healthcare products through direct sales, as well as through "beauty boutiques" that were independently owned and operated. In addition to its independent sales representatives, AVON CHINA had between 1,000 and 2,000 employees.  AVON CHINA's books, records, and accounts were consolidated into Avon's books and records and reported by Avon in its financial statements.

5.     "Avon China Executive 1," a Taiwanese citizen who resided in China, was a senior executive at AVON CHINA from in or around 1999 through in or around April 2010.

6.     "Avon China Executive 2," a Chinese citizen who resided in China, was a senior executive in the Corporate Affairs, State Government, and Media Relations group ("Corporate Affairs Group") of AVON CHINA from in or around 1999 through in or around April 2010. The Corporate Affairs Group consisted of approximately 40 employees, whose duties included lobbying government officials on behalf of AVON CHINA.

7.     At all times relevant to this Statement of Facts, "Consulting Company A," was a Chinese company that purportedly provided government and public relations work for AVON CHINA.

2

8.     "Avon Executive 1," a United States citizen, was a senior executive in Avon's Asia Pacific Region (which included China) and Avon's China Region (during times it was not part of the Asia Pacific Region) from in or around 2002 to in or around February 2011.

9.     "Avon Executive 2," a United States citizen, held a variety of positions at Avon from 1972 through April 2010, including a senior finance position in Avon's Asia Pacific Region from in or around February 2005 to in or around May 2006. From in or around May 2006 through in or around February 2009, Avon Executive 2 was a senior executive in Avon's internal audit group.

10.     "Avon Executive 3," a United States citizen, was a senior executive in Avon's internal audit group from in or around June 2003 to in or around February 2006.

11.     "Avon Attorney 1," a United States citizen, was a senior executive in Avon's Office of the General Counsel from in or around 2001 through in or around December 2007.

12.     "Avon Attorney 2," a United States citizen, was an executive in Avon's Office of the General Counsel from in or around 1993 to in or around August 2006. In that position, Avon Attorney 2 was responsible for providing legal advice to Avon's international subsidiaries.

13.     "Avon Internal Auditor 1," a dual Chinese and Canadian citizen, was an internal auditor at Avon from in or around August 2005 to in or around July 2008.

### The Chinese Regulatory Regime for Direct Selling

14.     In or around 1998, the Chinese government outlawed direct selling in China for all companies.

15.     In or around 2001, as a condition of its entry to the World Trade Organization, China agreed to lift its ban on direct selling. In or around 2005, in order to test its planned

regulations for direct selling, the Chinese government decided to issue one company a temporary license to conduct direct sales (the "test license").

16.     In or around March 2005, the Chinese government awarded the test license to AVON CHINA.

17.     In or around late 2005, China lifted its ban on direct selling and allowed companies to apply for licenses to conduct direct sales. Under China's newly promulgated direct selling regulations, to conduct direct sales, a company was required to obtain a national direct selling license and approvals from each province and municipality in which it sought to conduct direct sales. In order to obtain a license, a company was required to satisfy a number of conditions, including, in pertinent part, having "a good business reputation" and a record that demonstrated no material violations of Chinese law for the preceding five years.

18.     In or around February 2006, AVON CHINA obtained its national direct selling license.

19.     Between in or around February 2006 and in or around July 2006, AVON CHINA obtained all of its provincial and municipal approvals to conduct direct selling.

### Overview of the Scheme to Falsify Books and Records

20.     At all times relevant to this Statement of Facts, AVON CHINA maintained a Corporate Affairs Group whose duties included maintaining "guanxi" (good relationships) with government officials and lobbying those officials on behalf of AVON CHINA.

21.     AVON CHINA, primarily through Avon China Executives 1 and 2, tasked its Corporate Affairs Group with lobbying government officials to enable AVON CHINA to: (1) obtain a national license and requisite provincial and local approvals to conduct direct sales in China; (2) avoid government fines, the imposition of which AVON CHINA executives and

4

employees believed could cause AVON CHINA to lose its direct selling license; (3) avoid negative media reports that could hurt AVON CHINA's image or cause it to be fined, thus endangering its direct selling license; (4) obtain favorable judicial treatment; and (5) obtain government approval to sell nutritional supplements and healthcare apparel products, via direct selling, that did not meet or had yet to meet government standards.

22.     AVON CHINA's Corporate Affairs Group engaged in a routine practice of giving things of value to Chinese government officials in order to carry out its assigned tasks. Additionally, other AVON CHINA executives and employees also provided things of value to government officials to obtain business benefits for AVON CHINA.

23.     Avon China Executive 2 instructed Corporate Affairs Group employees not to maintain accurate, detailed records of things of value, including cash, gifts, and non-business meals, entertainment, and travel, they gave to government officials in the course of carrying out their assigned tasks.

24.     AVON CHINA's Corporate Affairs Group, and other AVON CHINA executives and employees, intentionally falsified records and intentionally omitted information from records so as to conceal the things of value they provided to government officials

25.     AVON CHINA and Avon executives and employees knowingly concealed from other Avon executives and others that AVON CHINA's books and records failed to reflect accurately and fairly the nature and purpose of certain transactions, knowing that AVON CHINA's books and records would be consolidated into Avon's books and records.

### *Details of the Scheme*

26.     From at least in or around 2004 through in or around September 2008, AVON

CHINA, acting through certain executives and employees, disguised on its books and records

over $8 million in things of value, including gifts, cash, and non-business travel, meals, and

entertainment, which it gave to Chinese government officials in order to obtain and retain

business benefits for AVON CHINA.

27.     AVON CHINA executives and employees falsely and misleadingly described the

nature and purpose of certain transactions on AVON CHINA's books and records, in part,

because they believed that Chinese government officials did not want a paper trail reflecting their

acceptance of money, gifts, travel, entertainment and other things of value from AVON CHINA

executives and employees.  The executives and employees also knew that, contrary to how the

expenses were being described in AVON CHINA's books and records, the expenses were not

incurred for legitimate business purposes.

28.     In order to conceal its executives' and employees' practice of giving things of

value to Chinese government officials, from at least in or around 2004 through in or around

September 2008, AVON CHINA executives and employees intentionally falsified certain

transactions on AVON CHINA's books and records by, among other things, falsely describing

expenses related to government officials as employee-related or falsely or misleadingly

describing the nature or purpose of, or participants associated with, such expenses in order to

conceal that the expenses related to government officials or that there were expectations of

benefits from government officials.  Additionally, the executives and employees of AVON

CHINA intentionally falsified AVON CHINA's books and records by falsely recording

payments to Consulting Company A as payments for legitimate services, notwithstanding the

6

fact that Avon China Executive 2 knew that Consulting Company A's invoices were often false and no AVON CHINA executives or employees knew of any legitimate services being provided by Consulting Company A.

29.     Avon executives and employees, including high-level executives, attorneys, and internal auditors, learned that AVON CHINA executives and employees had in the past routinely provided things of value to Chinese government officials and failed to properly document it. Instead of ensuring the practice was halted, disciplining the culpable individuals, and implementing appropriate controls at Avon and AVON CHINA to address this problem, the Avon executives and employees, in conjunction with AVON CHINA executives and employees, took steps to conceal the significant concerns raised about the accuracy of AVON CHINA's books and records and its practice of giving things of value to government officials. These Avon and AVON CHINA executives and employees, knowing that AVON CHINA's books and records would continue to be inaccurate if steps were not taken to correct AVON CHINA's executives' and employees' conduct, failed to take steps to correct such actions, despite knowing that AVON CHINA's books and records were consolidated into Avon's books and records.

*Gifts for Government Officials*

30.     From in or around 2004 through in or around September 2008, AVON CHINA executives and employees intentionally falsified AVON CHINA's books and records related to gifts given to Chinese government officials, including Avon products and personal luxury items like designer wallets, bags, or watches, to obtain benefits from government officials, such as obtaining and retaining the direct selling license and requisite provincial and local approvals, avoiding fines, avoiding negative media reports, obtaining favorable judicial treatment, and obtaining government approval to sell nutritional supplements and healthcare apparel products,

7

via direct selling, that did not meet or had yet to meet government standards. At various times, AVON CHINA executives and employees concealed in the books and records the actual purposes of the gifts, the identity of the recipients, or the price per gift. Also, AVON CHINA executives and employees, at various times, falsely or misleadingly described the gifts, including describing them as employee travel and entertainment, "samples," or "public relations business entertainment." AVON CHINA executives and employees falsely or misleadingly described such expenses in order to conceal that gifts were given to government officials with an expectation of receiving a business benefit.

31.     For example, employees of AVON CHINA falsely or misleadingly described gifts as follows:

a.      In or around October 2006, AVON CHINA employees falsely described approximately $890 of "gifts" for government officials as an "entertainment" expense, and omitted from the records the recipient of the gifts and the purpose of the gifts.

b.      In or around March 2008, AVON CHINA employees inaccurately described an approximately $960 gift purchased from Louis Vuitton for a government official as a "public relations entertainment" expense, and omitted from the records the recipient of the gift and the purpose of the gift.

c.      In or around July 2008, AVON CHINA employees falsely described an approximately $800 Gucci bag given to a government official as a "business entertainment" expense, and omitted from the records the recipient of the bag and the purpose of the gift.

d.      On or about July 2008, AVON CHINA employees falsely described an approximately $460 gift from Louis Vuitton for a government official as a "Public Relation Business Entertainment" expense, and omitted from the records the recipient of the gift and the

purpose of the gift.

*Meals and Entertainment*

32.     From in or around 2004 through in or around September 2008, AVON CHINA executives and employees routinely entertained government officials in order to obtain specific business benefits, such as obtaining and retaining the direct selling license and requisite provincial and local approvals, avoiding fines, avoiding negative media reports, obtaining favorable judicial treatment, and obtaining government approval to sell nutritional supplements and healthcare apparel products, via direct selling, that did not meet or had yet to meet government standards.

33.     Indeed, in or around August 2005, Avon China Executives 1 and 2 created a "Direct Selling Special Task Force," which was comprised primarily of employees from the Corporate Affairs Group, whose task was to obtain provincial direct selling approvals for AVON CHINA through "relations," which was a term AVON CHINA executives and employees used to refer to things of value provided to government officials or goodwill that had been obtained by giving such things, including non-business meals and entertainment.

34.     Members of the Direct Selling Special Task Force and other AVON CHINA executives and employees intentionally concealed improper meal and entertainment expenses in AVON CHINA's books and records by (1) intentionally omitting reference to the participation of government officials in order to conceal their participation, using descriptions like "business entertainment," "public relation entertainment," or no description at all; or (2) revealing the participation of government officials but intentionally describing the event inaccurately by omitting the identity or number of officials, the cost of the event, or the true purpose of the event.

35.     As a result, meal and entertainment expenses for government officials were falsely or misleadingly described on AVON CHINA's books, including the following expenses:

a.     In or around 2006, AVON CHINA employees falsely described as "sales-business entertainment" approximately $8,100 an AVON CHINA executive spent on meals and entertainment provided to government officials in order to obtain government approval to sell a healthcare apparel product that did not meet government standards.

b.     In or around January 2008, AVON CHINA employees falsely described as "business entertainment" and employee "accommodation" expenses, approximately $3,206 spent on meals, entertainment, and lodging for government officials.

*Travel for Government Officials*

36.     From in or around 2004 through in or around September 2008, AVON CHINA executives and employees caused AVON CHINA to pay for travel expenses for government officials, and sometimes their families, in order to obtain improper business benefits, including obtaining and retaining the direct selling license and requisite provincial and local approvals, avoiding fines, avoiding negative media reports, obtaining favorable judicial treatment, and obtaining government approval to sell nutritional supplements and healthcare apparel products, via direct selling, that did not meet or had yet to meet government standards. To conceal the true nature of these expenses, these executives and employees intentionally omitted from or concealed in AVON CHINA's records the names of the government officials, the fact that the travelers were government officials or relatives of government officials, and, at times, the number of travelers.

37.     AVON CHINA executives and employees also intentionally falsified in AVON CHINA's books and records the purpose of the travel, which often was for personal, not

legitimate business, purposes. For example, AVON CHINA employees described personal trips for government officials (and occasionally their spouses and children) as "study trips" or "site visits" when the officials were instead sightseeing or taking a beach vacation.

38.     As a result, non-business travel expenses for government officials were falsely or misleadingly described on the books of AVON CHINA, including the following expenses:

a.     In or around December 2005, Corporate Affairs Group employees sought approval to take six officials from the Guandong Food and Drug Administration with responsibility for approving AVON CHINA's healthcare products for sale, to the United States, purportedly for a "site visit/study visit" to Avon's headquarters in New York City and its research and development facility in upstate New York.

b.     In or around September 2006, AVON CHINA employees falsely described the approximately $90,000 AVON CHINA spent on a trip for four of those officials in AVON CHINA's books and records as a business-related site visit and study trip for Chinese government officials, notwithstanding the fact that the officials never visited Avon's headquarters, only spent one morning at Avon's research and development facility, and spent the rest of the 18-day trip sightseeing and being entertained by an AVON CHINA employee in New York, Vancouver, Montreal, Ottawa, Toronto, Philadelphia, Seattle, Las Vegas, Los Angeles, Hawaii, and Washington, DC.

c.     In or around January 2008, AVON CHINA employees falsely described in AVON CHINA's books and records as a "site visit to Guangzhou" for "3 aic [Administration of Industry and Commerce] officials," approximately $1,200 worth of expenses associated with a personal trip AVON CHINA provided to a government official and the official's spouse and child to Guangzhou and Macau.

d.    In or around January 2008, AVON CHINA employees falsely described in AVON CHINA's books and records as "site visit/inspection" expenses approximately $15,400 AVON CHINA paid for government officials to travel to Guangzhou, Shenzhen, and Sanya, notwithstanding the fact that the underlying records include charges for a tour guide, sightseeing van, and items purchased at the beach.

e.    In or around February 2008, AVON CHINA employees falsely described in AVON CHINA's books and records as "business entertainment" approximately $11,000 AVON CHINA paid for separate trips for two government officials who oversaw AVON CHINA's activities in the Shaanxi Province (and no AVON CHINA employees) to take personal trips to celebrate the Chinese New Year; one, a 9-day personal trip to Hainan Island and the other, a 12-day personal trip that included stays in Hong Kong and Macau.

*Cash for Government Officials*

39.    From in or around 2004 through in or around September 2008, AVON CHINA executives and employees gave cash to government officials in order to receive benefits for AVON CHINA and falsified AVON CHINA's records to conceal the true recipient of and purpose for the money.

40.    In large part, these employees accomplished this by submitting for reimbursement meal or entertainment receipts given to them by government officials and falsely claiming that the receipts reflected employee business expenses. In truth, the employees had no such expenses, and the receipts were used to obtain cash to make payments to government officials. On occasion, employees would falsely submit receipts for multiple meals on the same date, none of which the employees had actually attended.

41.    In other instances, Corporate Affairs Group employees and other AVON CHINA executives and employees gave cash to government officials in order to obtain business benefits for AVON CHINA and falsely reported the payments as fine payments. AVON CHINA executives and employees also made payments to organizations designated by government officials in order to obtain business benefits for AVON CHINA and intentionally omitted from AVON CHINA's records the true purpose of the payments.

42.    Due to these practices, from in or around 2004 through in or around September 2008, cash given to government officials was falsely or misleadingly described on the books and records of AVON CHINA.

43.    For example, AVON CHINA employees falsely or misleadingly described the following cash payments to government officials:

Cash to Avoid a Fine

a.    On or about August 16, 2006, Avon China Executive 2 approved a request from a Corporate Affairs Group employee to send RMB 100,000 (approximately $12,000) to a government official's bank account to avoid a fine for violating China's direct selling regulations.

b.    On or about August 17, 2006, to support the request for a RMB 100,000 payment to a government official, the requesting Corporate Affairs Group employee submitted a handwritten certificate, purportedly from a Chinese government agency, falsely stating that the official would give the funds to the government bureau.

c.    On or about August 17, 2006, an AVON CHINA employee caused RMB 100,000 to be wired in three separate wires to the government official's personal bank account.

d.    In or around late August 2006, an AVON CHINA finance employee sent

13

an email to an AVON CHINA employee, who forwarded it to Avon China Executive 2, stating that "the company paid RMB 100,000 to [the Chinese government official] as compensation payment and now we need to enter it into the book."

e.      In or around late August 2006, notwithstanding that the AVON CHINA finance employees knew the payment to the government official was "compensation," they recorded the payment in the "management expenses – government relations expenses" account as a legitimate payment related to "issue of aic [Administration for Industry and Commerce] in [] county of [] province."

Sponsorship to Avoid a Negative Media Article

f.      In or around December 2006, Avon China Executive 2 expressed concern to the Corporate Affairs Group that an article a leading government-owned newspaper intended to run about AVON CHINA improperly recruiting sales associates could cause AVON CHINA to lose its direct selling license.

g.      In or around December 2006, in order to convince the newspaper not to run the article, a Corporate Affairs Group employee caused AVON CHINA to pay approximately RMB 620,000 (approximately $77,500) to become a "sponsor" of the paper at the request of a government official at the paper who was in charge of determining whether the potential article would run and who may have received a commission on monies received from sponsors.

h.      In or around December 2006, a Corporate Affairs Group employee sent an internal email regarding the potential article, noting that the "the story alerted us to re-consider to invest more time and efforts on building key medium's relationship. [The paper] is the one with responsibility to submit confidential memo to the State Counsel and release media story to public

as well."

*Payments to Consulting Company A*

44.    In or around October 2003, Avon China Executive 2 retained Consulting Company A purportedly to "provide the following services upon [AVON CHINA's] request: (1) crisis management; (2) government relations; and (3) coordinate with public security authorities." In exchange for these services, which were memorialized in a scant two-page contract with AVON CHINA, AVON CHINA contracted to pay Consulting Company A $2,000 to $7,000 per month plus expenses.

45.    AVON CHINA executives and employees did not conduct any due diligence on Consulting Company A, nor did they require Consulting Company A to comply with Avon's Code of Conduct (in particular, the provisions related to payments to government officials), even though Consulting Company A was retained specifically to interact with government officials on behalf of AVON CHINA.

46.    From in or around October 2003 through in or around September 2008, AVON CHINA executives and employees caused AVON CHINA to pay Consulting Company A additional monies for purportedly legitimate, though ambiguously described, services even though Avon China Executive 2 knew Consulting Company A's invoices were often false, and no AVON CHINA executives or employees knew of any legitimate services being provided by Consulting Company A.

47.    For example, on or about June 1, 2005, AVON CHINA employees falsely described approximately $43,000 that AVON CHINA paid Consulting Company A as "PR Fees" and "sponsorship" in connection with a purported art exhibition, even though the exhibition never occurred.

15

48.     Additionally, in or around January 2008, AVON CHINA employees falsely described as a legitimate government relations expense approximately $25,900 paid to Consulting Company A purportedly for "communication service fee; business entertainment; transportation; hotel/lodging; telecommunications; material preparation" in connection with a threatened RMB 500,000 (approximately $66,000) fine for violating the direct selling regulations, even though no AVON CHINA executives or employees knew of any legitimate services actually being performed by Consulting Company A.

49.     On many occasions from in or around October 2003 through in or around October 2005, Avon China Executive 2 delivered cash to Consulting Company A and then sought reimbursement from AVON CHINA by submitting, or instructing the executive's assistant to submit, Consulting Company A's vague invoices that falsely described the expenses identified therein as related to legitimate travel, entertainment, or public relations expenses.

*Discovery of the Falsification and Resulting Cover-Up*

50.     On or about June 2, 2005, a senior audit manager in Avon's internal audit group reported to Avon's Compliance Committee, which was comprised of several senior Avon executives, that AVON CHINA executives and employees were not maintaining proper records of entertainment for government officials and that Avon China Executive 2 had explained that the practice was intentional because information regarding that entertainment was "quite sensitive."

51.     In or around September 2005, Avon's internal auditors audited the Corporate Affairs Group's travel and entertainment and discretionary expenses and issued a draft report documenting their findings (referred to herein as the "Draft Audit Report").

52.     On or about September 29, 2005, Avon China Executive 2 told the internal audit team that AVON CHINA executives and employees could not record the names of government officials who were given gifts or entertained or the purpose of the gifts or entertainment because government officials did not want their participation in these activities recorded and that if AVON CHINA maintained such records, government officials would sever their ties with AVON CHINA, which would harm AVON CHINA's business prospects.

53.     The Draft Audit Report, which was reviewed by Avon China Executives 1 and 2; Avon Executives 1, 2, and 3; Avon Attorneys 1 and 2; and others at Avon and AVON CHINA, contained conclusions regarding the Corporate Affairs Group's expenses including: (1) high value gifts and meals were offered to government officials on an ongoing basis; (2) the majority of the expenses related to gifts, meals, sponsorships, and travel of substantial monetary value for Chinese government officials to maintain relationships with the officials; (3) a third party consultant was paid a substantial sum of money to interact with the government but was not contractually required to follow the FCPA, was not actively monitored by AVON CHINA, and was paid for vague and unknown services; and (4) the payments, and the lack of accurate, detailed records, may violate the FCPA or other anti-corruption laws.

54.     On or about September 29, 2005, Avon China's management team, including Avon China Executives 1 and 2, insisted that the internal audit team remove the discussion of providing things of value to government officials and potential FCPA violations from the Draft Audit Report for fear that the report would be seen by Chinese government officials, other Avon or AVON CHINA employees, or AVON CHINA's competitors.

55.     On or about September 29, 2005, Avon Executives 2 and 3 agreed with AVON CHINA executives, including Avon China Executives 1 and 2, to delete the discussion of the

Corporate Affairs Group's conduct from the Draft Audit Report. Avon Executive 3 then directed the internal audit team to remove the language from the Draft Audit Report. Avon Executive 2 thereafter directed the internal audit team to either (1) retrieve every copy of the Draft Audit Report and destroy them or (2) instruct the individuals who possessed copies of the Draft Audit Report to destroy them.

56. In or around October and November 2005, Avon Executives 1, 2, and 3, Avon Attorneys 1 and 2, and others gathered additional information regarding AVON CHINA executives' and employees' practice of giving things of value to Chinese government officials. They also collected information showing a lack of FCPA controls.

57. In part, this information was gathered by Avon Internal Auditor 1, who was sent to China to obtain additional information regarding things of value being provided to government officials and was instructed by Avon Executive 2 not to create any electronic records or send any emails when gathering this information, and not to use "FCPA" in any documents or emails. Avon Internal Auditor 1 gathered the requested information, which further documented the Corporate Affairs Group's practice of giving things of value to government officials, and gave it to Avon Executive 2 on two handwritten sheets of paper. Avon Executive 2 then hand-carried the handwritten papers to Avon's headquarters in New York, New York.

58. In or around November 2005, Avon China Executive 2 sent a letter to Avon China Executive 1, with a copy to Avon Executive 1 (Avon China Executive 2 also later forwarded the letter to Avon Attorney 2), stating:

> no job security is very much disturbing due to the recent unrealistic questioning by GIA [global internal audit]. I am not against [...] auditing our expenses, but company's policy should be reasonably flexible for us to work. We are not working for our interest, but for creating a favorable business environment for the company. CA department is like a fighting brigade, we are most of the time have

to fight in a muddy field, if we get on our hands some dirt, it is not our fault! We should be much protected.

59.    In or around November 2005, Avon China Executive 2 sent another letter to Avon China Executive 1 expressing concern about Avon China Executive 2's job because Avon China Executive 2 had to "work through some grey areas for the company's best interest." Avon China Executive 2 also stated concern that the Corporate Affairs Group would lose all of its "guanxi" (good relationships) if it was required to follow Avon's rules regarding gifts and entertainment and maintain detailed records of the gifts and entertainment.

60.    In or around December 2005, in light of the issues identified in the Draft Audit Report, Avon Executive 2 and Avon China Executive 2 discussed hiding at Avon China Executive 2's house an off-book record with the names of recipients and details of the things of value provided to government officials. However, Avon China Executive 2 ultimately did not do so. Additionally, an Avon attorney with responsibility for the China region provided to Avon China Executive 2 FCPA compliance language to add to future contracts with Consulting Company A but that language was never added to the contract. However, Avon executives did not instruct any AVON CHINA executives or employees to stop the conduct identified in the Draft Audit Report. Moreover, neither Avon nor AVON CHINA executives or employees put in place controls to prevent the conduct or ensure the accuracy of AVON CHINA's books and records.

61.    In or around December 2006, Avon's internal auditors again reviewed the Corporate Affairs Group's travel and entertainment and discretionary expenses and found that Corporate Affairs Group executives and employees were continuing their practice of giving things of value to government officials, were not accurately documenting the expenses (on or off site), and had still not incorporated FCPA compliance language in Consulting Company A's

contracts. Notwithstanding learning that the conduct was continuing and that AVON CHINA's books and records were still being falsified, no Avon or AVON CHINA executives or employees took steps to stop or prevent the conduct from recurring, and AVON CHINA executives and employees continued operating in the same improper manner.

62.    In or around January 2007, Avon Executive 2 reported to Avon's Compliance Committee that the matter regarding potential FCPA violations by AVON CHINA executives and employees had been closed as "unsubstantiated," even though Avon Executive 2 and other Avon executives, attorneys, and employees knew of AVON CHINA's previous – and continuing – practice of giving things of value to government officials and the ongoing failure of AVON CHINA's books and records to reflect accurately and fairly the nature and purpose of certain transactions, as well as Avon's and AVON CHINA's ongoing failure to implement internal controls to prevent such conduct from continuing in the future.

63.    From in or around 2004 through in or around September 2008, to ensure the consolidation of Avon China's false books and records into AVON's books and records, Avon China executives, including Avon China Executive 1, signed false management representation letters to Avon China's external auditor stating that Avon China's books and records were fair and accurate.